# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>GREGORY LAMONT HUGHES SIMMONS,<br>JR. aka Gregory Lamont Hughes, Jr., Gregory<br>Lamont Hughes, Gregory Lamont Simmons,<br>Gregory L. Hughes, Jr., Gregory L. Hughes<br>Simmons, Gregory L. Hughes, Gregory<br>Lamont Hughes, Gregory L. Hughes, Gregory<br>Lamont Simmons-Hughes, Gregory Lamont<br>Hughes, Jr.,<br><br>Appellant. | No. 48576-1-II<br><br>UNPUBLISHED OPINION |

JOHANSON, J. — Gregory Lamont Hughes Simmons Jr. appeals his theft of a motor vehicle-domestic violence conviction and sentence. Simmons raises numerous arguments. We hold that the State's charging decision was proper, sufficient evidence supports the domestic violence designation, the trial court did not err by admitting evidence of Simmons's prior acts once Simmons "opened the door," and the State did not engage in prosecutorial misconduct. In addition, we hold that the trial court erred when it ordered forfeiture of property and the trial court did not err when it imposed mandatory legal financial obligations (LFOs). We affirm Simmons's conviction but remand to strike the forfeiture condition from the judgment and sentence.

FACTS

The State charged Simmons with theft of a motor vehicle, including a domestic violence designation. At trial, the State's evidence included third party eyewitness testimony and the victim's testimony.

## I. EYEWITNESS TESTIMONY

On August 12, 2015, Lauren Lozada's car was stolen. Renee Brooks witnessed a man approach the car and drive it away. Brooks later identified Simmons in a photo array and also identified him as the perpetrator at trial.

## II. STATE'S DIRECT EXAMINATION OF VICTIM

Lozada was over the age of 16 and in a dating relationship with Simmons from some point in early to middle 2014 to February 2015. She owned a Chevy Caprice acquired when she was dating Simmons.

In July 2015, Lozada was at court for a criminal incident when a friend informed her that Simmons was at Lozada's car. Concerned that Simmons was trying to break into her car, Lozada left the court and found him sitting on the hood of her vehicle. Lozada approached her vehicle and told Simmons that "he needed to go and leave my car alone." 2 Report of Proceedings (RP) at 53. Simmons responded, "[T]hat's not happening." 2 RP at 53.

Lozada walked away and Simmons followed her, attempting to grab Lozada and take her keys. Lozada entered a café seeking help, but she and Simmons were told to leave. They went to the back of the café, and Simmons held Lozada down and took her key chain with her car remote. Lozada was "just trying to get away from him" and testified that "[t]he only way I was able to was giving him a ride to . . . his father's house." 2 RP at 54. Simmons gave Lozada her car key, and

Lozada provided the ride that Simmons requested. However, Simmons kept the remote to the security system.

On August 12, Lozada learned that her car was missing. She contacted the police and reported the incident. A couple of days later, Lozada went onto a website and noticed that parts of her car were being sold by a profile associated with Simmons.

Approximately a month after Lozada's car was stolen, she saw Simmons driving in a vehicle that appeared to have Lozada's stolen wheels. Lozada contacted law enforcement and police arrested Simmons.

### III. DEFENSE CROSS-EXAMINATION OF VICTIM

During Lozada's cross-examination, defense counsel asked questions about her contact with Simmons after their February 2015 breakup. Defense counsel asked whether she continued to see him. Lozada responded, "Not too much. He would make appearances at my schools. He would make appearances at my house. He would threaten to come to my grandma's house, and he would make it a hassle for me not to be able to get away from him." 2 RP at 84.

In addition, defense counsel asked whether Lozada took any long trips with him. Lozada initially said no, but then described an incident in which Simmons learned of Lozada's plans to visit Las Vegas and forced Lozada to take him with her. When defense counsel asked if Lozada "allowed" Simmons to come to Las Vegas with her, she said,

> I didn't allow him because he had beaten me up when he seen me. He had thrown me in the car, held me against my will, and made it to where he was going with me and he was making me drive.
> . . . .
> . . . I wasn't going to argue when he was physically doing damage to me.

2 RP at 85-86. Lozada also stated that she did not go to the police about the incident.

3

The State objected, and the jury was excused. During the break, the trial court heard argument on whether questions about the Las Vegas trip should be allowed. Defense counsel argued that the line of questioning was relevant to show "whether the relationship was somewhat congenial and that she may have often lent him that car." 2 RP at 88. He also said that Lozada had testified that her relationship with Simmons "was over in February of '15, yet I have knowledge that they took a long trip in . . . early August on their way to Las Vegas." 2 RP at 88. He said that he wanted to explore the nature of Lozada and Simmons's relationship, including whether Lozada was honestly portraying their interactions.

The State argued that the Las Vegas trip was "not really relevant at all." 2 RP at 89.

Defense counsel responded that it was relevant because

I'm allowed to explore bias, interest, and prejudice and that she has some bias, interest, and prejudice because of an ex-lover that she may not be too happy with in alleging that he stole her car when, in fact, he may have taken it because she allowed him to take it.

2 RP at 90. The trial judge allowed the questions, saying, "I will give [defense counsel] some leeway." 2 RP at 91.

Defense counsel continued to question Lozada about the Las Vegas trip, including why she didn't drive away when she and Simmons stopped during the trip, and why she did not reach out to civilians or police for help along the way. Lozada said she did not contact the police about the kidnapping because "I was scared and I didn't want them to not be able to do something and him know that I was reporting him as trying to kidnap me so he could hurt me further." 2 RP at 97. Defense counsel responded, "Okay. But when your car was stolen, you didn't have a problem calling the police over that?" 2 RP at 97.

4

Defense counsel also asked about how many times Lozada loaned her car to Simmons. Lozada responded that she had "never handed him the keys and said it was okay for him to drive." 2 RP at 105. Lozada stated that when she and Simmons were in a dating relationship, Simmons drove Lozada's car without her permission a "[f]ew times" and would take the keys from her without permission, which led to arguments. 2 RP at 106. On several occasions, Simmons made keys so he could drive Lozada's car, and Lozada changed the ignition and locks to prevent Simmons's access to the car.

IV. STATE'S REDIRECT OF VICTIM

On redirect, the State said, "[Defense counsel] asked you a lot about things you didn't do. With regard to the defendant, has he ever been violent with you?" 2 RP at 112. Lozada said yes, and when asked to elaborate, said that Simmons had "[h]it me, beat me up, choked me." 2 RP at 112.

Defense counsel then objected, arguing that statements about prior crimes not yet discussed in testimony were "prejudicial and not relevant to the allegation." 2 RP at 113. The State responded,

> The door was opened, Your Honor. He inquired into a lot of things that didn't happen [during the Las Vegas trip,] asking her and challenging her as to why she didn't do certain things in the car, didn't take certain steps. And I feel, especially in a domestic violence relationship and in this sort of context, this is absolutely relevant to explain the door that Counsel opened.

2 RP at 113.

The trial court overruled the objection.

The State proceeded with its questions asking, "Did he ever break any bones?" 2 RP at 113. Lozada answered, "He has cracked ribs." 2 RP at 113. The State asked Lozada if she had

5

planned to go to Las Vegas with Simmons, and she responded that she intended to go to Las Vegas

alone and stay with her uncle in Las Vegas for an event, but that Simmons forced her to take him.[1]

V.  STATE'S INITIAL CLOSING

In its initial closing argument, the State summarized the evidence establishing Simmons's

guilt.  The State identified each element required to establish theft of a motor vehicle and explained

how each element of the charged crime was proved beyond a reasonable doubt.

To prove that Simmons wrongfully obtained or exerted unauthorized control over a motor

vehicle *of another*, the State discussed Lozada's testimony that the stolen vehicle belonged to her

and pointed to an exhibit showing that the car was registered to Lozada.  And to show that

Simmons wrongfully obtained or exerted unauthorized control over the car, the State discussed

Brooks's eyewitness testimony and her subsequent identification of Simmons as the perpetrator.

To prove that Simmons intended to deprive Lozada of the motor vehicle, the State focused

on evidence showing that the car had been stripped and parts of it sold.  The State pointed to the

condition of the car before it was stolen and after it was found, as established in two different

photographs of the vehicle before and after the theft.  And the State discussed Lozada's testimony

and related exhibits supporting that Simmons was selling parts of Lozada's car on the Internet.

Next, the State said in relevant part,

[A]s the Court noted, this is charged as a domestic violence incident.  So in the state
of Washington, what that means is you look to whether or not the defendant and
the victim were what are called family or household members. . . . And in
Washington law, a person is a family or household member, for purposes of this
determination, as defined under special verdict form.  A family or household
member means a person 16 years of age or older with whom a person 16 years of
age or older has or has had a dating relationship.  Has or has had, meaning that if

---

[1] After the State rested its case, the defense rested without presenting any testimony or evidence.

they had a relationship in the past, . . . if there was a dating relationship, then the answer to this question is yes. . . .

. . . .

. . . We heard that . . . Ms. Lozada and the defendant had begun dating in 2014, that the relationship had ended in February of 2015, so that by August when this crime was committed, they had had a dating relationship.

3 RP at 225-26.

In the State's initial closing, it did not mention prior acts of domestic violence against Lozada nor did it mention the Las Vegas trip.

## VI. DEFENSE CLOSING

In its closing, defense counsel focused on undermining Lozada's credibility as a witness. He said that because the State charged the car theft as a domestic violence incident, "the relationship between the parties are important for you to decide and to consider." 3 RP at 229. He argued that Lozada lacked credibility because on direct examination she claimed that she and Simmons broke up in February and that she had no more contact with Simmons until he allegedly took her car remote in July; yet she disclosed on cross-examination that between February and July, she went to Las Vegas with Simmons. Defense counsel elaborated,

And she said something that defense would argue was completely incredible and goes to her credibility, and that is she ended up saying, "Oh yeah, we went to Vegas." Her explanation for going to Vegas is for you to consider in light of everything else, but since credibility is important, the defense simply argues, if you believe the story about going to Vegas and being kidnapped, if you believe that, then I guess you believe everything else she said and then that's the case.

But according to her, he showed up, somehow knowing she was going to Vegas, invited himself along, gave her five minutes to get ready, and off they went. She did refer to it as a kidnapping because I asked her if it was. Yet she told you she couldn't get away. She was driving the car. They stopped for gas at one point. She couldn't get away. . . . She didn't mention anything to anyone about being kidnapped or being there against her will, and came the whole way back here and never mentioned it, never called anyone. . . .

But then I made the point of saying you didn't report a felony kidnapping but then when your car was missing, you reported that right away, no hesitation.

7

3 RP at 230-31.

Defense counsel also raised arguments that Lozada was prejudiced and biased because she was "jilted":

> Now, the other point that the defense is trying to argue here is who was actually the jilted one? Who was the one that wasn't happy that they were broken up? Who was the one that had an ax to grind . . . ? Who's got bias, prejudice, or interest? . . . You might recall that she made a point of saying that when she went out and he was on the hood of the car and they went to a coffee shop, she kept talking about his girlfriend was there. And she brought that up, and suddenly, what she told us was some sort of domestic violence incident, and next thing you know, she's giving him a ride somewhere.
>
> So it starts to get strange where this is a person who she's trying to get away from and yet spends considerable amount of time with him, apparently voluntarily, for you to decide, and even does things for him.

3 RP at 231-32.

### VII. STATE'S REBUTTAL CLOSING ARGUMENT

During rebuttal, the State provided an alternate explanation for Lozada's behavior and motivations:

> You know, it's interesting in a domestic violence case that, yeah, a victim of domestic violence might act in a way that, at first blush, doesn't seem very rational, right? After being in a relationship that didn't go so well, after her boyfriend, the defendant, broke her ribs, punched her, attacked her, regularly came to her home, threatened to come to her grandmother's home, after one day he shows up at her house, finding out she has a plan to go out of town, saying you can't go out of town on your own. I'm not going to allow that. Doesn't matter that our relationship ended months ago. I'm going to physically assault you, force you into the car. Yeah, it's not the same kind of planning as sitting down with someone who's in a mutually respectful relationship with you, right? Sure. . . .
>
> . . . [B]ut you know what it does not bear upon, has nothing to do with? Her credibility. . . . Whether or not she was going to have a safety plan . . . when she got to Vegas or whatever doesn't bear on her credibility. It's a completely separate thing that has nothing to do with this case . . . .
>
> Yeah, we didn't dwell on this Vegas trip because this Vegas trip has nothing to do with anything. Certainly, it bears upon the fact that she was in a domestic violence relationship with the defendant. Certainly, it shows maybe some control

and some power that he exercised over her, but it's not relevant to any of those elements . . ., which is what you're actually here to determine.

3 RP at 235-36.

VIII. VERDICT AND SENTENCING

The jury convicted Simmons as charged. The trial court ordered forfeiture of property as a condition of his judgment and sentence. The trial court also imposed mandatory LFOs totaling $800.

ANALYSIS

I. SUFFICIENT EVIDENCE

Simmons argues that sufficient evidence did not support that the crime was a domestic violence incident. But Simmons acknowledges that under RCW 10.99.020(3), a domestic violence incident is a crime committed against "family or household members." He further agrees that a person meets the definition of "'family or household member'" under RCW 10.99.020(3) if they are 16 or older and they have had a dating relationship at any point in time. Br. of Appellant at 10. Here, undisputed evidence established that Simmons stole Lozada's car, that Lozada was over 16 years old at the time, and that they had a dating relationship. Thus, sufficient evidence supports the domestic violence designation.

II. IMPROPER CHARGING DECISION

Simmons asserts that the prosecution improperly introduced prejudicial evidence by charging the car theft as a domestic violence case. He appears to argue that the domestic violence designation was charged by the State for the purpose of admitting prejudicial evidence regarding Simmons's prior acts of violence. Br. of Appellant at 16. To support this claim, Simmons relies

on *State v. Gunderson*, 181 Wn.2d 916, 337 P.3d 1090 (2014), and *State v. Ashley*, 186 Wn.2d 32, 375 P.3d 673 (2016). We reject Simmons's argument for two reasons.

First, to the extent Simmons challenges the State's *charging* decision, his argument fails. Generally, the decision to determine and file appropriate charges is vested in the prosecuting attorney as a member of the executive branch. *State v. Rice*, 159 Wn. App. 545, 560, 246 P.3d 234 (2011), *aff'd*, 174 Wn.2d 884, 279 P.3d 849 (2012). Simmons cites no authority to support that the charging decision itself was improper, but instead relies on cases that address whether the trial court properly admitted evidence of the defendant's prior acts under ER 404(b). Because Simmons provides no citation to authority regarding the *charging* decision, we do not address that argument further. RAP 10.3(a)(6).

Second, Simmons's argument fails because *Gunderson* and *Ashley*, relied on by Simmons, are inapplicable. In *Gunderson*, the State sought to admit evidence under ER 404(b) to impeach its own witness and thereby support its case in chief. 181 Wn.2d at 920-21. In contrast, Simmons *opened the door* to questions about Simmons's acts of domestic violence and insisted, against the State's objection, that prior interactions between Simmons and Lozada *were* relevant. In *Gunderson*, there was no similar "opening of the door" by the defense. *See* 181 Wn.2d at 920-25. Thus, Simmons has not demonstrated that *Gunderson* is applicable here.

Similarly, Simmons's case is distinguishable from *Ashley* because *Ashley* did not address admission of evidence under the theory that defense had "opened the door." *See Ashley*, 186 Wn.2d 35-47. Simmons has failed to demonstrate that *Ashley* is applicable here.

In sum, we hold that Simmons's claim that the State improperly introduced prejudicial evidence by charging the car theft as a domestic violence claim fails.

### III. DEFENSE OPENED THE DOOR TO PRIOR ACTS EVIDENCE

Simmons claims that the prosecution "swung open the door to evidence of uncharged alleged acts" and argues that the trial court improperly allowed Lozada to testify about Simmons's prior acts of violence against her. Br. of Appellant at 12. We disagree.

### A. PRINCIPLES OF LAW

We review a trial court's determination that a party has opened the door for an abuse of discretion. *State v. Ortega*, 134 Wn. App. 617, 626, 142 P.3d 175 (2006). A trial court abuses its discretion if its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). A decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported by the record or was reached by applying the wrong legal standard. *Rohrich*, 149 Wn.2d at 654.

"A party's introduction of evidence that would be inadmissible if offered by the opposing party 'opens the door' to explanation or contradiction of that evidence." *Ortega*, 134 Wn. App. at 626 (quoting *State v. Avendano-Lopez*, 79 Wn. App. 706, 714, 904 P.2d 324 (1995)). The open door rule "is intended to preserve fairness" by preventing the introduction of one-sided testimony that the opposing party has no opportunity to rebut. *Avendano-Lopez*, 79 Wn. App. at 714. It is not error to admit prior acts evidence when defense counsel opens the door to the evidence. *State v. Korum*, 157 Wn.2d 614, 646, 141 P.3d 13 (2006). A party may not set up error at trial and then complain about the error on appeal. *In re Pers. Restraint of Tortorelli*, 149 Wn.2d 82, 94, 66 P.3d 606 (2003).

## B. SIMMONS OPENED THE DOOR

When Simmons objected to the State's questions on redirect regarding Simmons's prior abuse of Lozada, the trial court ruled that the defense had opened the door to the State's question regarding prior incidents of domestic violence. We review the trial court's determination that Simmons opened the door for an abuse of discretion. *Ortega*, 134 Wn. App. at 626.

The record shows that defense counsel was the first party to ask Lozada about Simmons's prior abuse. The State's direct examination of Lozada was confined to events relevant to the charged car theft. During Lozada's cross-examination, defense counsel asked numerous questions about whether Lozada ever consented to Simmons's use of her car and also asked about her contact with Simmons after their February 2015 breakup, which led to testimony that Simmons abused her and engaged in unwanted contact. Defense counsel specifically asked about an incident in which Lozada claimed she was forced to drive Simmons to Las Vegas against her will.

When the prosecutor objected to the line of questioning, defense counsel insisted it was relevant to show "whether the relationship was somewhat congenial and that she may have often lent him that car." 2 RP at 88. He also said that he wanted to explore the nature of Lozada and Simmons's relationship, including whether Lozada was honestly portraying their interactions and whether she "has some bias, interest, and prejudice." 2 RP at 90.

Defense counsel's questioning, intended to show that Lozada "lent" Simmons the car and portray Lozada and Simmons's relationship as "congenial," opened the door for the State to respond with an "explanation or contradiction of that evidence." *Ortega*, 134 Wn. App. at 626. To "preserve fairness" and prevent the introduction of one-sided testimony, the State was entitled to an opportunity to rebut defense counsel's theory. *Avendano-Lopez*, 79 Wn. App. at 714.

Contrary to Simmons's claim that testimony of the Las Vegas incident was "designed to ensure that he was portrayed in a dangerous light,"[2] the State had tried to prevent the defense from asking questions about the incident and, on redirect, merely rebutted Simmons's claims that Simmons and Lozada had an ongoing friendship.

Simmons now asserts that Lozada's testimony regarding Simmons's prior abuse was "irrelevant and highly prejudicial." Br. of Appellant at 14. But it is clear that the State's redirect *became relevant* when Simmons opened the door by asking Lozada about her trip to Las Vegas with Simmons, suggested that the trip was consensual rather than coerced by Simmons, and sought testimony to support that Simmons and Lozada had a "congenial" relationship after their breakup. And although the testimony that Simmons caused Lozada physical injury was prejudicial, the State used it to rebut defense counsel's theory that Lozada didn't report the "kidnapping" because the kidnapping didn't really happen.

The State used the prior domestic violence evidence to provide an alternative theory as to why Lozada didn't report the "kidnapping" to police. The State's theory was that Lozada was afraid of Simmons based on his prior physical abuse and therefore didn't report the kidnapping because of her fear of what Simmons might do to her. In addition, the State did not use this evidence in their case in chief nor in their initial closing argument. The State invoked this prior domestic violence evidence only to rebut the defense's evidence and the defense closing argument.[3]

---

[2] Br. of Appellant at 13.

[3] Simmons cites to ER 404(b) in connection with his arguments that Lozada's testimony of Simmons's prior acts was improperly admitted. But Simmons does not provide an analysis applying the ER 404(b) framework or allege that the trial court failed to conduct an ER 404(b) on-

The trial court's decision to admit the State's questions about Simmons's prior abuse was not based on untenable grounds. Instead, the evidence was properly admitted because Simmons opened the door to evidence of Simmons's prior abuse when Simmons sought to establish that he and Lozada had a "congenial" relationship in which Lozada "lent" Simmons her car. As such, the trial court did not abuse its discretion in admitting the testimony.

## IV. PROSECUTORIAL MISCONDUCT

Simmons appears to claim that the prosecutor engaged in misconduct by eliciting testimony about Simmons's prior abuse of Lozada and then making improper closing argument related to Simmons's prior acts of domestic violence. We disagree.

### A. PRINCIPLES OF LAW

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). To establish prejudice, the defendant must prove that there is a substantial likelihood that the misconduct affected the jury's verdict. *Thorgerson*, 172 Wn.2d at 442-43. When the defense does not object and request a curative instruction, the defense waives the issue of misconduct unless the statement was so flagrant and ill intentioned that an instruction could not have cured the prejudice. *Thorgerson*, 172 Wn.2d at 442-43.

---

the-record balancing. Arguments unsupported by meaningful analysis need not be considered. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We decline to address ER 404(b) further.

It is not misconduct for a prosecutor to argue that evidence does not support a defense theory. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Moreover, the prosecutor is entitled to make a fair response to the arguments of defense counsel. *Russell*, 125 Wn.2d at 87.

## B. NO PROSECUTORIAL MISCONDUCT

Simmons did not object at any point during the State's closing argument or rebuttal. As such, Simmons has waived the issue of prosecutorial misconduct unless he can show that the prosecutor's conduct was so flagrant and ill intentioned that an instruction could not have cured the prejudice. *Thorgerson*, 172 Wn.2d at 442-43. But Simmons does not even argue that the prosecutor's conduct was so flagrant and ill intentioned that an instruction could not have cured the prejudice. Thus, we hold that Simmons has failed to preserve this claim.

Even if Simmons had preserved this claim, this claim fails. Simmons's argument misrepresents the prosecution's use of the evidence and thus fails to show that the State engaged in *any* misconduct, let alone misconduct that was "flagrant and ill intentioned."

Contrary to Simmons's assertion, the prosecution did not elicit testimony about prior abuse to establish that the car theft was a domestic violence incident and thus show Simmons's propensity to commit the charged crime. Instead, the prosecution only introduced the evidence to rebut Simmons's claims that Lozada and Simmons were "congenial" after their breakup and that Lozada lent Simmons her car.

Furthermore, the prosecution did not "exploit" the evidence of Simmons's abuse in the State's closing argument. In fact, the prosecution did not mention the prior acts of domestic violence in its initial closing arguments. The State, only in rebuttal, mentioned Simmons's prior acts of domestic violence in response to defense counsel's closing argument claims that Lozada

was not credible and that Lozada consented to Simmons taking her car. The prosecutor was entitled to make a fair response to defense counsel's arguments and use evidence to undermine the defense theory. *Russell*, 125 Wn.2d at 87. Simmons has failed to show that the prosecutor's actions were improper.

In short, Simmons has failed to even argue that the State's action was so flagrant and ill intentioned that an instruction would not have cured the prejudice, so he has waived his prosecutorial misconduct claim. And even if preserved, Simmons has failed to establish that the State's conduct was improper, so his prosecutorial misconduct claim fails.

## V. FORFEITURE CONDITION

Simmons argues that the trial court erred when it ordered forfeiture of his property. A trial court has no inherent or statutory authority to order in a judgment and sentence forfeiture of all property seized. *State v. Roberts*, 185 Wn. App. 94, 96-97, 339 P.3d 995 (2014). Here, the trial court, in the judgement and sentence, ordered Simmons to "forfeit items in property." Clerk's Papers at 72. We accept the State's concession that this order was improper and remand to strike the forfeiture condition from the judgment and sentence.

## VI. LFOs

Simmons argues that the trial court erred when it failed to consider his ability to pay before imposing LFOs. But trial courts are not required to inquire into defendant's ability to pay *mandatory* LFOs. *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013). Here, the trial court imposed a $500 crime victim assessment, a $100 deoxyribonucleic acid collection fee, and a $200 filing fee. Each of these LFOs are required by statute and thus are mandatory. *Lundy*, 176 Wn. App. at 102. Because the trial court imposed only mandatory LFOs, Simmons's claim fails.

No. 48576-1-II

## VII. APPELLATE COSTS

Simmons argues that the court should not impose appellate costs. Accepting the State's representation that it will not seek appellate costs, we decline to order them.

We affirm Simmons's conviction but remand to strike the forfeiture condition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.

17